**Affirmed and Memorandum Opinion filed November 29, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00488-CV

## IN THE INTEREST OF M.A.F.R., Y.A.V-F., AND I.A.V., JR., CHILDREN,

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-02299J**

## M E M O R A N D U M    O P I N I O N

Father appeals the trial court's final decree terminating his parental rights as to his son, Max,[1] and appointing the Texas Department of Family and Protective Services ("the Department") as sole managing conservator of Max. On appeal, Father challenges the legal and factual sufficiency of the evidence to support the predicate ground under which his parental rights were terminated. We affirm.

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014 & Supp. 2018); Tex. R. App. P. 9.8.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Department History

In April 2013, the Department received a referral alleging neglectful supervision of Max and his two younger siblings, Yvonne and Isaac, by their Mother. According to the referral, Mother was arrested for public intoxication after law enforcement received a report that Mother was driving erratically. All three children were in Mother's vehicle when law enforcement arrested her. Mother was incarcerated on an outstanding warrant for a charge of assault and family violence. Two days later, the Department filed a petition to terminate the rights of Mother as to Max, Yvonne, and Isaac. The petition alleged Mother had a history of leaving the children alone and often being intoxicated around the children. The trial court named the Department temporary managing conservator of the children. The Department placed the children in foster care because no suitable family members could be located to care for the children. Mother informed the Department that she believed Max's father was in jail, but that she did not know his last name.

The trial court appointed an attorney ad litem for Father until the Department could locate him. The Department eventually found Father, and a DNA test proved he was the father of Max. At that time, Father was incarcerated on a 25-year sentence for aggravated sexual assault. The Department was unable to locate the fathers of Yvonne and Isaac. Yvonne and Isaac are not subject to this appeal.

In April 2014, the trial court appointed the Department as sole managing conservator of the children and made no findings as to Father. The trial court did not terminate Mother's parental rights at that time. In June 2016, the Department placed all three children together in their current foster placement with the intention the placement be permanent. In March 2017, the Department filed a motion to modify

conservatorship and for termination. In January 2018, the foster parents brought a petition in intervention for termination of the parent-child relationship and adoption of a child.

## II. Trial Proceedings

Trial on the Department's motion to modify commenced on April 17, 2018. At the time of trial, Max was fourteen years old, and the trial court admitted into evidence a letter he wrote to the court. The letter reads as follows:

Dear Court –

My name is [Max] and I'm 14 years old. I have been in foster care for 5 years. I want the court to know I love where I'm at now. I want to stay with my brother and sister and with my foster parents. I want to be adopted by them. They are awesome people, they take care of me, and they help me with my homework. I feel safe and HAPPY here. I enjoy being a part of this family.

I don't really remember [Father]. I think the first time I met him he was in prison. I don't know what to write because I don't know much about him. I know that I don't want to be sent to Mexico. I don't want to have a relationship with him. I don't know him or any part of his family.

PLEASE DON'T MAKE ME LEAVE MY HOME!!!

I really really want to be adopted by my foster parents, and stay with my brother and sister. [sic]

The trial court also admitted into evidence (1) a judgment on Father's plea of guilt for evading arrest in 2004, (2) a judgment on Father's plea of guilt for a charge of driving while intoxicated in 2007, and (3) Father's conviction of aggravated sexual assault in 2008. At the time of trial, Father was still incarcerated on a 25-year sentence for an aggravated sexual assault conviction. Father was present at trial pursuant to a bench warrant.

## A. Department Caseworker

The Department's caseworker testified that she had been trying to contact Father's family in Mexico for six months without success. According to the caseworker, Max found the idea of moving to Mexico with unknown family members to be shocking. The caseworker further testified that Max does not remember his Father and wants to be adopted by his foster parents. Max does not want to be separated from his siblings and has confirmed multiple times that he does not want to move to Mexico with his paternal relatives. Yvonne and Isaac have also stated they want to stay with their siblings and be adopted by their current foster parents. According to the caseworker, all three children are well-bonded with their foster parents and have expressed that they love and respect their foster parents. The caseworker testified that she believed it was in the best interest of the children for all parental rights to be terminated. It was the caseworker's opinion that the children would be adversely affected if any of them were separated.

## B. Child Advocate

On behalf of Child Advocates, the child advocate testified that the children are very happy in their current placement. Their happiness is reflected in their behavior and performance at school. The child advocate spoke with Father's Mother (Grandmother) at length about taking the children. Grandmother lives in Mexico and indicated she was willing to take only Max. The child advocate also spoke with a paternal aunt in Mexico who stated she could not care for three children.

## C. Father

Father testified that he was aware Mother was pregnant with Max and has known about Max's existence since Max's conception. Father admitted he is not able to care for Max because he is incarcerated. Father further testified that he is aware Max wants to be adopted by his foster parents. Father also agreed that it would not be in Max's best interest for Father's rights not to be terminated, thereby preventing

4

him from being adopted. However, Father testified that he believes Max is too young to make this decision for himself. Father also admitted that even if he is released early, potentially in two and a half years—when Max will be 16—Father will be deported to Mexico.

Father also agreed that Max's relationship with his siblings is important. Father testified it could hurt Max to take him away from his siblings and move him to Mexico with unknown relatives. Father, however, maintained that Max was too young to make this decision and expressed a desire to talk it over with Max. Father testified that Grandmother indicated to Father that she is willing to take all three children and that Grandmother has repeatedly tried to contact the Department. According to Father, Max lived with Father's uncle ("Uncle") from the ages of three to five, but Mother took Max from Uncle. Father said Max did not want to go with Mother when she took him from Uncle, but that Uncle did not want to cause any problems with Mother. Father admits Uncle is willing to take only Max and not Yvonne or Isaac. Father said he understands Max does not want to move to Mexico, so Father requested that Max be placed with Uncle. Further, Father requested a "goodbye" visit with Max if Father's right were terminated. Father testified he has tried to send gifts and letters to Max, but that the Department told him he could not.

### D. Foster Mom

Foster Mom testified that she has a great bond with the children and that she wants to give them a home for the rest of their lives. According to Foster Mom, the children have made marked improvement in their confidence, school performance, and social skills in the course of the two years they have been in Foster Parents' home. Specifically, Foster Mom testified Max "does great at everything he tries to do." According to Foster Mom, when Max first came into her care he was lonely and kept to himself, but now he has taken on the "big-brother role." In discussing the

adoption with the children, they have all demonstrated frustration about how long the adoption process is taking and are very ready to be adopted. Foster Mom testified that she loves the children.

### E. Trial Court's termination of parental rights

After testimony concluded, the Department requested Mother's and Father's parental rights be terminated. Specifically, the Department requested Father's rights be terminated under section 161.001(b)(1)(E) (concerning endangerment of the child), based upon Father's criminal activity since Max's birth. The trial court agreed and terminated Mother's and Father's parental rights. In its final decree, the trial court found termination of Mother's and Father's rights to be in the children's best interest.

## ANALYSIS

In his sole issue on appeal, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings necessary for termination under section 161.001(b)(1)(E) of the Texas Family Code. Father does not challenge the trial court's determination that it is in Max's best interest for Father's parental rights to be terminated.

## I.     Burden of Proof and Standard of Review

Parental rights can be terminated upon clear and convincing evidence that (1) the parent has committed an act described in section 161.001(b)(1) of the Family Code and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not

6

absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *Id*.

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code. Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d at 358. "But the constitutional and statutory requirement that parental rights cannot be terminated unless grounds for termination are established by clear and convincing evidence necessarily means that the ultimate burden of proof based on clear and convincing evidence remains with the party seeking to terminate the parental rights." *In re L.M.I.*, 119 S.W.3d 707, 720 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a

reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d at 712.

## II. Predicate termination ground

The trial court terminated Father's parental rights based on its predicate finding under Texas Family Code section 161.001(b)(1)(E). Termination of parental rights is warranted under this section if the Department proves by clear and convincing evidence, in addition to the best-interest finding, that Father has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Conduct" under subsection (E) includes acts, omissions, or failures to act. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.").

Father contends that while the evidence shows he is imprisoned for a

8

committing a serious crime, it does not prove that his incarceration was part of a deliberate course of conduct that endangered Max's physical and emotional well-being. The Department responds by arguing that Father has knowingly acted in disregard of his legal and ethical duty to Max for Max's entire life, thereby jeopardizing Max's emotional well-being.

Max was born in March of 2004. Father testified he was aware that Mother was pregnant was Max in 2003. Father was arrested for evading arrest within a year of Max's birth and spent ten days in jail. Father was again arrested on February 8, 2007 for driving while intoxicated and spent another ten days in jail. In July of 2009, a jury found Father guilty of aggravated sexual assault and sentenced him to 25 years' imprisonment. The grand jury indictment indicates that Father brandished a knife during the commission of the sexual assault. Max's letter to the court indicates Father is a stranger to Max. Max referred to Father by Father's first and last name in his letter and Max stated that he does not know Father. Father himself testified that he has never "personally" had contact with Max.

When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents, like Father, repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being. *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Father has been absent from Max's life since Max was born, in part as a result of his incarceration, and in part for reasons the record does not reflect. This court has further stated that a propensity for violence is further evidence of endangerment. *Id*. Father's crime of aggravated sexual assault indicates Father has a propensity for violent behavior.

Additionally, a parent's lack of demonstrated concern for a child's well-being is evidence of endangerment. *Id*. While it is true that imprisonment alone does not

constitute engaging in conduct which endangers the emotional or physical well-being of a child, in this instance, Father abandoned Max to the care of Mother years before Father was incarcerated. *See Boyd*, 727 S.W.2d at 533 (finding imprisonment to be a part of a course of conduct having the effect of endangering the physical or emotional well-being of a child); *In re S.M.L*, 171 S.W.3d at 479-80 (considering as evidence of endangerment father's lack of demonstrated concern for his child in addition to his incarceration). Max is fourteen years old and Father is only now demonstrating interest in Max's life. Father had fourteen years to take an interest in his son's life, but Father remains a stranger to Max. Father's abandonment of Max from birth and Father's violent sexual crime constitutes a course of conduct that endangered Max's emotional and physical well-being.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor, we conclude that there was some evidence of endangerment on which a reasonable factfinder could have formed a firm belief or conviction of endangerment. *In re J.O.A.* 283 S.W.3d at 346.

## CONCLUSION

Having overruled Father's sole issue on appeal, we affirm the trial court's judgment.


/s/    Martha Hill Jamison
       Justice


Panel consists of Justices Christopher, Jamison, and Brown.